**UNITED STATES DISTRICT COURT**    **EASTERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA    §
§
*versus*    §    CASE NO. 9:18-CR-43
§
WINFRED EARL WARE, JR.    §

## MEMORANDUM AND ORDER

Pending before the court is Defendant Winfred Earl Ware, Jr.'s ("Ware") Motion for Sentence Reduction Under the Compassionate Release Statute, 18 U.S.C. § 3582(c)(1)(A)(i), as Amended by the First Step Act (#239),[1] wherein he requests that the court release him from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons" due to the threat of the COVID-19 pandemic ("COVID-19"). The Government filed a response in opposition (#242). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

On November 14, 2018, a federal grand jury in the Eastern District of Texas returned a three-count Indictment, charging Ware in Count One with Conspiracy to Possess with Intent to Distribute a Controlled Substance (Methamphetamine), in violation of 21 U.S.C. § 846, in Count Two with Obstruction of the Due Administration of Justice, in violation of 18 U.S.C. § 1503, and

---

[1] In addition to his motion, Ware filed a Motion to Expand the Record (#238) in which he attaches various documents in support of his motion for compassionate release. The court will consider Ware's evidence in its evaluation of his motion for compassionate release. Accordingly, Ware's Motion (#238) is granted.

in Count Three with Tampering with a Witness by Misleading Conduct, in violation of 18 U.S.C. § 1512(b)(1).  Following an eight-day jury trial, Ware was found guilty of all three counts.  On November 26, 2019, the court sentenced Ware to 180 months' imprisonment, followed by a five-year term of supervised release on Count One; 120 months' imprisonment, followed by a three-year term of supervised release on Count Two; and 180 months' imprisonment, followed by a five-year term of supervised release on Count Three, all to run concurrently.

On August 14, 2020, less than one year after his sentencing, Ware filed a Motion to Reduce Sentence (#200), wherein he requested release to home confinement.  Ware contended in his motion that the Bureau of Prisons's ("BOP") inadequate response to the COVID-19 pandemic qualified as an extraordinary and compelling reason warranting his release.  The court denied his motion on September 14, 2020, finding that no extraordinary and compelling reasons existed in relation to Ware's situation.  Specifically, the court found that while "Ware expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Ware, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated."  The court additionally opined that, "[i]n view of the circumstances surrounding his offenses of conviction and criminal history, the court cannot conclude that he would not pose a danger to any other person or to the community, if released from prison."  Thus, the court declined to allow Ware to be released on home confinement.

The United States Court of Appeals for the Fifth Circuit subsequently affirmed Ware's conviction and sentence on January 13, 2022.  Ware is currently housed at Federal Correctional

Institution, Beaumont (Low) ("FCI Beaumont Low"), located in Beaumont, Texas. His projected release date is October 3, 2030.

II.    Analysis

A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see* 18 U.S.C. § 3582(c). Section 3582(c)(1)(A) embodies a rare exception to a conviction's finality. This statute gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment. The First Step Act of 2018 ("the Act"), Pub. L. No. 115-391, 132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

> (A) the court, upon motion of the Director of the [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a)[2] to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or

---

[2] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions and policy statements; any pertinent policy statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jean*, 108 F.4th 275, 278 (5th Cir. 2024), *abrogated on other grounds by United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025); *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission had issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the United States Court of Appeals for the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b). These categories are: (1) the medical circumstances of the defendant; (2) the age of the defendant; (3) the family circumstances of the defendant; (4) whether the defendant was a victim of abuse while in custody; (5) other reasons similar in gravity to those previously described; and (6) an unusually long sentence. *Id*. § 1B1.13(b)(1)-(6). The Fifth Circuit has clarified, however, that "prisoners have extraordinary and compelling reasons for relief 'only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner.'" *Austin*, 125 F.4th at 692 (quoting *Escajeda*, 58 F.4th at 186).

As a result, a prisoner seeking compassionate release on his own motion must satisfy the following hurdles:

(1)    the defendant must have exhausted his administrative remedies;

(2)    "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii);

(3)    the reduction must be consistent with the Commission's applicable policy statements; and

(4)    the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors.

*See Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022); *see Austin*, 125 F.4th at 692.

A.    Exhaustion of Administrative Remedies

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory").  Accordingly, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Although this requirement is said to be mandatory, the Fifth Circuit has treated it as "a nonjurisdictional claim-processing rule."  *Franco*, 973 F.3d at 468.  "Mandatory but nonjurisdictional procedural filing requirements may be waived."  *United States v. McLean*, Nos. 21-40015, 21-40017, 2022 WL 44618, at *1 (5th Cir. Jan. 5, 2022); *see United States v. Harden*, No. 4:11-CR-127-SDJ, 2025 WL 562716, at *5 (E.D. Tex. Feb. 20, 2025).  Therefore, if the Government fails to "invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief," that argument is deemed waived.  *McLean*, 2022 WL 44618, at *1.

6

A defendant's motion for compassionate release must be based on the same circumstances as those raised in his request for release to the warden of the facility where he is housed. *United States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion"); *accord United States v. Thomas*, No. 4:19-CR-28-SDJ, 2023 WL 5279457, at *5 (E.D. Tex. Aug. 16, 2023) (citing *United States v. Mendoza-Garibay*, No. 4:13-CR-00281, 2023 WL 307459, at *1 (E.D. Tex. Jan. 18, 2023)). Hence, the facts asserted in an inmate's request to the warden and in his motion for compassionate release must be consistent. *United States v. Scott*, No. CR 17-114, 2024 WL 2187849, at *2 (E.D. La. May 14, 2024); *see United States v. Gonzalez*, 849 F. App'x 116, 117 (5th Cir. 2021).

Here, it is unclear whether Ware has exhausted his administrative remedies. Ware argues that he has exhausted his administrative remedies because more than 30 days have passed since he submitted a request for compassionate release to the warden, and he received no response. The record reflects that on June 12, 2023, Ware submitted an "informal request for compassionate release" to the warden of his facility. His request, however, does not provide a reason for his seeking compassionate release. The request simply asks that his sentence be reduced to time served under 18 U.S.C. § 3582(c)(1)(A), as amended by the Act, and provides no further detail or justification. In his pending motion, filed on September 1, 2023, Ware contends that his motion should be granted due to the "extraordinary and compelling reasons confronting the [BOP] as a result of the COVID-19 disaster—which has progressed from a pandemic to an endemic threat to those forced to live in congregate living conditions such as prisons." Thus, it does not appear that

Ware raised the same grounds for compassionate release in his request to the warden as he now asserts in his motion.

Nonetheless, the Government does not contend that Ware failed to exhaust his administrative remedies.  In fact, the Government's response makes no mention of Ware's duty to exhaust his administrative remedies with regard to the current motion.  Thus, the Government has waived this procedural requirement, and Ware is not precluded from advancing his compassionate release motion based on non-exhaustion.  Nothing in his motion, however, indicates that extraordinary and compelling reasons exist to reduce his sentence and release him from prison at this time.

      B.    <u>Criteria for Release</u>

      1.    <u>Medical Condition</u>

In the pending motion, Ware, age 36, contends that he is eligible for compassionate release due to his medical condition.  Specifically, Ware asserts that he is severely and morbidly obese, as he stands six feet three inches tall, weighs 315 pounds, and has a body mass index ("BMI") of roughly 40.  Ware maintains that, according to the Centers for Disease Control and Prevention ("CDC"), individuals with a BMI of 40 or more are at an increased risk for severe illness from COVID-19.  Further, Ware argues that factors such as his ethnicity and gender greatly increase his vulnerability to severe illness or death if infected with COVID-19.  Ware further asserts that he has suffered from mental health issues while incarcerated, including major depressive disorder.  According to Ware, in December 2020, following the death of his mother, Ware experienced a mental health crisis that resulted in an unsuccessful attempt to commit suicide.  He was

subsequently diagnosed with post-traumatic stress disorder.  Ware, therefore, contends that his circumstances qualify as extraordinary and compelling reasons warranting his release.

With respect to a defendant's medical circumstances, § 1B1.13(b)(1)(A) states that extraordinary and compelling reasons exist if the defendant's motion presents the following circumstances:

> (A)  The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory).  A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-state organ disease, and advanced dementia.

U.S.S.G. § 1B1.13(b)(1)(A).  This provision is plainly inapplicable to the case at bar—none of Ware's medical conditions are terminal.  To the contrary, several of Ware's conditions listed in his medical records—such as low back pain, knee pain, sleep apnea, and astigmatism—are commonplace, and all of his afflictions are well managed with medication, treatment, and monitoring.  Although Ware has been diagnosed with conditions that could be considered more serious, such as hypertension (high blood pressure) and hyperlipidemia (high cholesterol), he has consistently been treated with medication and has been evaluated by medical staff numerous times to adjust the prescribed doses, as needed.  Ware's medical records also indicate that he underwent numerous tests to record any changes in these conditions.  Moreover, nothing in Ware's records suggests that his ailments are terminal, even in light of COVID-19.  Ware accordingly fails to demonstrate that his medical disorders constitute extraordinary and compelling reasons warranting compassionate release under § 1B1.13(b)(1)(A).

Ware's medical condition likewise fails to satisfy the criteria under § 1B1.13(b)(1)(B).  This provision applies when:

(B)     The defendant is—

    (i)     suffering from a serious physical or medical condition,

    (ii)    suffering from a serious functional or cognitive impairment, or

    (iii)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B).  Here, none of Ware's medical problems substantially diminish his ability to provide self-care within the context of a correctional facility.  Ware's medical records reveal that he is ambulatory, is cleared for food service, and does not medically qualify for a lower bunk.  Ware has been able to participate in a number of different educational courses and a drug abuse program.  He has a work assignment in the electric shop.  Thus, Ware's medical needs have not precluded him from working or participating in daily activities while incarcerated.  Moreover, there is no evidence to suggest that the BOP medical staff is not qualified to treat Ware's conditions.  When required, Ware has seen specialists for his health issues.  For example, Ware underwent a stress test that was evaluated by a cardiologist.  His conditions are also treatable with medication to which he has access through the BOP.  Although Ware struggles with a major depressive disorder, he is likewise being treated with medication, counseling, and close monitoring.

Additionally, there is reason to question the gravity of Ware's overall medical condition.  Despite Ware's lengthy medical records, a large number of these documents are not related to the afflictions about which Ware complains in his motion.  Indeed, a significant portion of these

records address matters such as sleep apnea, dental problems, vision issues, and lower back pain. There is no doubt that Ware struggles with hyperlipidemia and hypertension. The records indicate, however, that Ware has been consistently treated for these conditions through medication and testing. Indeed, Ware is classified as a Care Level I inmate by the BOP, denoting that he is less than 70 years of age, is generally healthy, and may have limited medical needs that can be easily managed by clinician evaluations every 6 to 12 months. Ware's healthcare professionals have also suggested that a change in diet would help normalize his cholesterol levels. Notwithstanding his doctors' orders, Ware has, on numerous occasions, chosen not to comply with his medication schedule by repeatedly failing to report to the pill line. Furthermore, Ware has failed to report for appointments and/or testing several times and has refused to take prescribed medication. Ware's behavior undercuts his insistence that his conditions are sufficiently severe to warrant release. Ultimately, Ware's maladies are not so serious that they substantially diminish his ability to provide self-care in the institutional setting. The court accordingly concludes that Ware's circumstances do not warrant compassionate release under § 1B1.13(b)(1)(B).

Ware is similarly ineligible for compassionate release under § 1B1.13(b)(1)(C), which provides that extraordinary and compelling reasons exist when:

> (C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(C). None of Ware's medical conditions require long-term or specialized care that is not being provided. To the contrary, Ware's conditions are well managed with medication, treatment, and monitoring. Again, Ware's medical records indicate that his hypertension and hyperlipidemia, while chronic, are controllable through medication. His other

more commonplace health issues are also being well addressed by medical staff. Ware has accordingly failed to show that without additional care he is at risk of serious deterioration of his health or death.  Thus, compassionate release is not merited under § 1B1.13(b)(1)(C).

Ware is likewise ineligible for compassionate release under § 1B1.13(b)(1)(D), which provides that extraordinary and compelling reasons exist when:

(D)     The defendant presents the following circumstances—

(i)      the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal state, or local authority;

(ii)     due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak or infectious disease or the ongoing public health emergency described in clause (i); and

(iii)    such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1)(D).  Importantly, "generalized concerns about COVID-19 cannot be deemed an 'extraordinary and compelling reason' for compassionate release under [§] 1B1.13." *United States v. Stehley*, No. 3:16-CR-14, 2023 WL 8014078, at *7 (W.D. Pa. Nov. 9, 2023); *see United States v. Rodriguez*, 27 F.4th 1097, 1100 (5th Cir. 2022) ("[A] generalized fear of COVID-19 does not automatically entitle a prisoner to release." (citing *United States v. Thompson*, 984 F.3d 431, 435 (5th Cir. 2021))); *Davis v. United States*, No. 3:22-CV-01410-L (BT), 2023 WL 9597200, at *4 (N.D. Tex. Nov. 15, 2023), *adopted by* No. 3:22-CV-01410-L-BT, 2024 WL 302487 (N.D. Tex. Jan. 25, 2024), *aff'd*, 124 F.4th 980 (5th Cir. 2025).  Rather, § 1B1.13(b)(1)(D) is concerned with "an 'ongoing outbreak of infectious disease' at a 'correctional facility'" that, due to a defendant's "personal health risk factors and

custodial status," "place[s] the defendant at 'increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak.'" *Id.* (quoting U.S.S.G. § 1B1.13(b)(1)(D)(i), (ii)). "As applied to COVID-19, this is no longer the case: Both international and domestic health authorities, including the World Health Organization, the United States Centers for Disease Control and Prevention, and the U.S. Federal Government, have made clear that the COVID-19 pandemic has ended. Thus, the COVID-19 pandemic no longer constitutes an 'extraordinary and compelling reason' for compassionate release." *United States v. Aaron*, No. 4:18-CR-46-SDJ, 2025 WL 696965, at *5 (E.D. Tex. Mar. 4, 2025). Nevertheless, even if the COVID-19 pandemic still constituted an "ongoing public health emergency," Ware cannot satisfy each of § 1B1.13(b)(1)(D)'s three prongs for his particular circumstances to be considered "extraordinary and compelling." *See* U.S.S.G. § 1B1.13(b)(1)(D)(i)-(iii).

First, compassionate release is not warranted because there is no current COVID-19 outbreak at FCI Beaumont Low, where Ware is presently housed. *See United States v. Babbitt*, No. 13-CR-10100, 2023 WL 7154102, at *3 (C.D. Ill. Oct. 31, 2023); *see also Stehley*, 2023 WL 8014078, at *7. Further, Ware has not presented evidence that shows FCI Beaumont Low is ineffectively controlling the spread of COVID-19. At present, the facility reports zero open cases, meaning there are no current, positive confirmed lab results for COVID-19 for any inmates out of a total inmate population of 4,889.[3] Hence, FCI Beaumont Low is not experiencing a "high-outbreak level" and, thus, does not appear to be affected by an ongoing COVID-19

---

[3] *Inmate COVID-19 Data*, Fᴇᴅ. Bᴜʀᴇᴀᴜ ᴏꜰ Pʀɪsᴏɴs, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last updated Jan. 21, 2025).

outbreak.  *See Babbitt*, 2023 WL 7154102, at *3 (holding that a correctional facility was not "affected with an ongoing COVID-19 outbreak" where the facility was "listed as a low-risk Level 1 Operation").

Next, as to Ware's "personal health risk factors and custodial status," Ware asserts that his race, gender, and high BMI place him at increased risk of suffering severe complications or death as a result of contracting COVID-19.  In this regard, according to the CDC website, these characteristics and underlying medical conditions make him more likely to become severely ill should he contract COVID-19.[4]  Thus, if FCI Beaumont Low was actually experiencing an ongoing outbreak of COVID-19, Ware could be "at increased risk of suffering severe medical complications or death as a result of exposure" to the virus.  There is no indication, however, that the COVID-19 pandemic has ever directly threatened Ware's life.  Ware's medical records show that he consistently tested negative for COVID from 2020 to 2023 and has never tested positive.  Although Ware came into contact with someone who tested positive for COVID-19 on more than one occasion, he was promptly quarantined, tested, and monitored each time.  Furthermore, Ware was always asymptomatic when being tested for the virus.

Although Ware might be at increased risk of adverse consequences, he cannot show that "such risk cannot be adequately mitigated in a timely manner."  Indeed, according to Ware's BOP medical records, he was given the opportunity to receive the COVID-19 vaccine on two separate occasions, yet he refused its administration without any suggestion that it was medically contraindicated.  Courts have routinely denied compassionate release to inmates who, like Ware,

---

[4] *COVID-19:  Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ clinical-care/underlyingconditions.html (Feb. 9, 2023).

have refused the COVID-19 vaccine.  *See United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("[A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release.  The risk is self-incurred."); *United States v. Seleznev*, No. 2:11-CR-00070-RAJ, 2021 WL 4804614, at *3 (W.D. Wash. Oct. 14, 2021) (finding that a single study where a COVID-19 vaccination caused a hepatitis C reactivation did not warrant compassionate release for the defendant who refused the vaccine based on inactive hepatitis B and latent tuberculosis).  Thus, although Ware has refused the vaccine, such an intervention likely would have mitigated his risk of contracting COVID-19 in a timely manner.  In other words, a vaccine refusal does not equate to the absence of any ability to mitigate his health risks.  While Ware expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage an outbreak within his correctional facility or that the facility is specifically unable to treat Ware, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated.  Accordingly, Ware is also unable to satisfy § 1B1.13(b)(1)(D)'s third prong.  Hence, Ware's concerns relating to COVID-19 in prison provide no basis for relief.

The court also considers Ware's request under § 1B1.13(b)(5)'s "catchall" provision.  The amended policy statement acknowledges that other reasons not specifically enumerated in the policy statement may provide a basis for compassionate release.  *See* U.S.S.G. § 1B1.13(b)(5).

> (5)    Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4) are similar in gravity to those described in paragraphs (1) through (4).

U.S.S.G. § 1B1.13(b)(5).  Here, Ware has failed to present any other circumstances or combination of circumstances that, considered by themselves or together with any of the reasons

specified in paragraphs (1) through (4), are similar in gravity to those already described above. Ware argues that his medical condition, ethnicity, and gender make him significantly more susceptible to severe illness and death from COVID-19. These contentions, while perhaps accurate, do not qualify as extraordinary and compelling reasons for compassionate release.

According to the CDC, 41.9% of the adult population in the United States is obese and 9.2% is severely obese.[5] Due to its pervasiveness, obesity cannot be deemed "extraordinary" in order to warrant compassionate release. *See United States v. Harmon*, 834 F. App'x 101, 101 (5th Cir. 2021) (affirming denial of compassionate release to a 52-year-old woman who was obese with a BMI of 36); *United States v. Luna*, No. 18-CR-00555-PAB-1, 2025 WL 81365, at *3 (D. Colo. Jan. 13, 2025) (denying compassionate release where the inmate, who weighed over 400 pounds, presented no evidence that his medical conditions were not being adequately treated during his incarceration); *United States v. Kaneko*, No. CR 19-00062 JMS, 2024 WL 1018362, at *5 (D. Haw. Mar. 8, 2024) (rejecting the notion that obesity alone is sufficient to rise to the level of an extraordinary and compelling reason); *United States v. Grimaldo*, No. 4:08-cr-107-SDJ, 2022 WL 4126106, at *5 (E.D. Tex. Sept. 9, 2022) (denying compassionate release to prisoner suffering from diabetes, high cholesterol, high blood pressure, obesity, and vision problems, noting that he failed to show how these afflictions presently affected his ability to provide self-care within the prison environment); *United States v. Grant*, No. 16-00172-01, 2021 WL 149308, at *4 (W.D. La. Jan. 15, 2021) (noting that "while obesity is an underlying medical condition that poses increased risk of severe illness from COVID-19, courts have found that

---

[5] According to the CDC, a body mass index ("BMI") below 18.5 is underweight, a BMI between 18.5 and 24.9 is normal, a BMI between 25 and 29.9 is overweight, and a BMI of 30 or above is obese. A BMI of 40 or greater is classified as severely obese.

obesity—alone or even paired with other medical conditions—does not provide adequate grounds for compassionate release"). Thus, the fact that Ware is considered obese, or even severely obese, does not rise to the level of an extraordinary and compelling reason for compassionate release.

Ware further contends that as an African American man, he is part of a racial or ethnic minority group that puts him at a higher risk of serious illness should he contract COVID-19. In considering Ware's motion for compassionate release, however, the court must take an "individualized and particularized review" of Ware's characteristics. *United States v. Ashley*, No. CR 17-00282-KD-B-1, 2020 WL 7771215, at *4 (S.D. Ala. Dec. 30, 2020) (citing *United States v. Tobias*, No. CR 19-143 (BAH), 2020 WL 4673414, at *5 (D.D.C. Aug. 12, 2020); *United States v. Brown*, No. 13-CR-00030 (ESH), 2020 WL 4346911, at *3 (D.D.C. July 29, 2020); *United States v. Joaseus*, No. 9:16-CR-80011-ROSENBERG, 2020 WL 3895087, at *2 (S.D. Fla. July 10, 2020)); *see United States v. Chavez*, No. 3:18-CR-0426-B-11, 2020 WL 4500633, at *3 (N.D. Tex. Aug. 5, 2020) ("[T]he Court must consider every prisoner individually and should be cautious about making blanket pronouncements." (quoting *United States v. Delgado*, No. 3:17-CR-242-B (01), 2020 WL 2542624, at *3 (N.D. Tex. May 19, 2020))). In doing so, the court finds that when viewing Ware individually, there is insufficient evidence that his race elevates his risk of becoming seriously ill from COVID-19 to such an extent as to satisfy the "extraordinary and compelling" standard necessary for compassionate release. *See United States v. Santiago*, No. 4:17-CR-17, 2025 WL 842807, at *6 (E.D. Va. Mar. 18, 2025) (holding that compassionate release was not warranted because defendant's demographic risk factors of COVID-19, such as race and sex, do not constitute extraordinary and compelling reasons); *United States v. Johnson*, No. CR 14-173, 2024 WL 3634185, at *3 (D.N.J. Aug. 1, 2024) (recognizing that

defendant's race and obesity make him vulnerable to COVID-19 yet declining to grant compassionate release on that basis); *United States v. Brown*, No. CR 18-20, 2020 WL 6261445, at *3 (E.D. La. Oct. 23, 2020) (finding that an African-American defendant had not shown his age, race, gender, or medical condition met the "extraordinary and compelling" standard). In fact, Ware appears to have avoided contracting COVID-19 for over five years while incarcerated, even when it was more prevalent in the prison population. Consequently, while Ware's ethnicity and gender may make him statistically more susceptible to serious effects from COVID-19, that is not an extraordinary and compelling reason warranting his release. Ware has therefore failed to present any other circumstance or combination of circumstances that are similar in gravity to those described in paragraphs (1) through (4).

2.     Rehabilitation

Alternatively, Ware maintains that his post-sentence rehabilitation, as evidenced by the courses he has taken, the programs he has completed, and his acceptance of responsibility, establishes extraordinary and compelling reasons for compassionate release. Specifically, Ware claims that he earned his GED, participated in the Department of Labor 8000 hour Electrician Apprenticeship Program, and completed the Drug Abuse Education Program. Regarding rehabilitation of the defendant, the Sentencing Guidelines recognize: "Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d); *accord United States v. Martinez*, No. 23-50418, 2024 WL 658952, at *1 (5th Cir.

Feb. 16, 2024) ("Even if [the defendant] were reformed, his rehabilitation efforts alone are not an extraordinary and compelling reason for release."); *United States v. Handlon*, No. 23-50386, 2024 WL 111787, at *1 (5th Cir. Jan. 10, 2024) (holding that the defendant's "rehabilitation efforts alone are not an extraordinary and compelling reason for his release").

Hence, while the court may consider rehabilitation efforts, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t); *accord United States v. Rios*, No. 24-673-cr, 2025 WL 841862, at *2 (2d Cir. Mar. 18, 2025); *United States v. Black*, 131 F.4th 542, 544 (7th Cir. 2025); *see United States v. Cordoba*, No. 24010599, 2025 WL 799354, at *1 (5th Cir. Mar. 13, 2025); *Shkambi*, 993 F.3d at 392; *United States v. Hudec*, No. CR 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 19, 2020) ("While the Court is permitted to consider post-sentencing rehabilitation in determining whether to grant an eligible defendant a sentence reduction, it is not authorized to grant a reduction based upon post-sentencing rehabilitation alone."). In fact, "[m]aking good use of one's time in prison is not uncommon, and indeed is expected." *United States v. Blanco*, No. 16-CR-408 (CS), 2021 WL 706981, at *2 (S.D.N.Y. Feb. 22, 2021) (quoting *United States v. Alvarez*, No. 89-CR-229, 2020 WL 4904586, at *7 (E.D.N.Y. Aug. 20, 2020)); *see United States v. Alimehmeti*, No. 16-CR-398 (PAE), 2024 WL 4880197, at *8 (S.D.N.Y. Nov. 25, 2024) (recognizing that some amount of rehabilitative effort is expected of inmates and holding that completion of educational courses and doing productive work while incarcerated did not justify early release). Further, "making good use of one's time in prison and regretting one's actions are not grounds for sentence reductions under the First Step Act." *United States v. Polnitz*, No. 17-cr-201-pp, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020). In any event, in *United States v. Comb*, the court

found a similar BOP log listing a defendant's participation in rehabilitative programs as proffered by Ware to be "wholly inadequate" for concluding that the defendant's rehabilitation was "beyond or out of the common order." No. H-13-0575-06, 2025 WL 240954, at *3 (S.D. Tex. Jan. 17, 2025) (quoting *Escajeda*, 58 F.4th at 186), *aff'd*, 2025 WL 603881 (5th Cir. Feb. 25, 2025).

Here, although Ware appears to have a relatively minor disciplinary record at the BOP, it is not apparent that he has been fully rehabilitated. On October 1, 2020, Ware was cited for refusing to obey an order when he took too long to eat. On December 3, 2020, Ware was again cited for refusing to obey an order when he continued to ask female staff about reviewing case material in the legal library. The next day, December 4, 2020, Ware was cited for tattooing or self-mutilation when staff observed him with a noose around his neck. Moreover, as the court noted above, Ware has a record of noncompliance with his medication and health monitoring schedules. In 2020, Ware refused his morning dose of Lexapro (his medication for depression) and refused to sign a refusal form when prompted by his BOP healthcare provider. Further noncompliance with the pill line was reported by Ware's doctors in both June and September of 2021. Ware also had an altercation with his cell mate in 2021 but no injuries were reported. In 2022, Ware declared a hunger strike after he was refused visitation access to his family, stating that he was also "opposed to any request to the court to force-feed [him]." In any event, Ware has failed to demonstrate that any other circumstances warrant a reduction in his term of imprisonment. Thus, even if the court were to conclude that Ware had been successfully rehabilitated, this fact, without more, does not merit compassionate release. U.S.S.G. § 1B1.13(d) (citing 28 U.S.C. § 994(t)). While the court hopes that Ware will continue on the

path to rehabilitation, it declines to exercise its discretionary authority under § 3582 at this time based on either Ware's medical condition or his rehabilitation efforts.

### 3. Sentencing Disparity

As an additional ground for relief, Ware argues that his sentence warrants a reduction due to sentencing disparity. In particular, Ware maintains that his sentence was wrongly enhanced based on the finding that his offense involved methamphetamine (actual) rather than methamphetamine (mixture). Ware further claims that many courts across the country are rejecting the application of the corresponding guideline enhancement for purity of methamphetamine on policy grounds. These arguments, however, constitute nothing more than an attempt to revisit determinations made by the court years ago at the time of his sentencing in 2019. Yet, a "compassionate release motion 'is not an opportunity to second guess or to reconsider' the sentencing court's original decision." *United States v. Jabateh*, No. CR 18-216-3, 2021 WL 5802493, at *2 (W.D. Pa. Dec. 7, 2021) (quoting *United States v. Roney*, 833 F. App'x 840, 854 (2d Cir. 2020)). Not only does Ware's request fall outside the scope of § 3582, the court declines to alter a final judgment based on Ware's perceived issues with how the Sentencing Guidelines were applied to the facts of his case. Indeed, as the Supreme Court has observed, "a final judgment commands respect." *United States v. Frady*, 456 U.S. 152, 165 (1982). Furthermore, numerous courts within this circuit have rejected the argument that the Guideline's methamphetamine purity distinction constitutes an extraordinary and compelling reason for a sentence reduction. *See United States v. Villa*, No. 3:12-CR-00320-N-14, 2025 WL 746518, at *4 (N.D. Tex. Mar. 7, 2025) ("[Defendant] is not entitled to compassionate release on the argument that the guidelines distinction between actual methamphetamine and methamphetamine

mixtures is unjust."); *Aaron*, 2025 WL 696965, at *5 (rejecting an inmate's request for the court to recalculate her base offense level to remove the distinction between methamphetamine actual and mixture); *United States v. Stewart*, No. 5:12-CR-00257, 2024 WL 3277380, at *3 (W.D. La. July 1, 2024) (holding that defendant's purity argument falls within the province of a direct appeal or a § 2255 motion, and, in any event, "the guideline's purity distinction does not constitute an extraordinary and compelling reason for a sentence reduction"), *appeal dismissed*, No. 24-30455, 2024 WL 5323487 (5th Cir. Aug. 27, 2024).  Thus, Ware's arguments concerning an alleged sentencing disparity in methamphetamine cases provide no basis for a reduction of his sentence.

C.    <u>Section 3553(a) Factors</u>

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  The nature and circumstances of Ware's offenses of conviction entail his participation in a methamphetamine trafficking conspiracy, his obstruction of justice, and his tampering with a witness by misleading conduct.  Regarding Ware's drug-trafficking activity, the Presentence Investigation Report ("PSR") indicates that, beginning in early 2014, Ware was a member of a drug trafficking organization ("DTO") that distributed methamphetamine primarily in Panola

22

County and Shelby County, Texas.  Within the DTO, Ware served as a source of supply for his co-conspirators, including Travarious Ingram ("T. Ingram"), Laryan Ingram ("L. Ingram"), and Tamar Tucker ("Tucker"), who then redistributed the methamphetamine and other narcotics from multiple locations.  When customers wanted methamphetamine, they typically contacted one of the DTO distributors via cellular telephone.  Once they reached an agreement concerning price, the customer and distributor would then go to a location where they could complete the purchase without drawing attention from law enforcement officers.  Members of the DTO also dealt in the distribution of stolen firearms contemporaneously with the narcotics operation.

During trial, Derek Harrison ("Harrison") testified that he knew Ware was dealing methamphetamine and synthetic marijuana.  The largest amount of methamphetamine Harrison had seen in Ware's possession was a pound (453 grams).  Ware allegedly showed Harrison almost a pound of "pink ice" (methamphetamine) while they were gambling at someone's house.  Ware then told Harrison that he sometimes distributed a pound of methamphetamine in less than a week.  Harrison also stated that he knew Ware dealt at least 12 ounces (340.19 grams) of methamphetamine per day and that Richard Lyles, who sold drugs for Ware, dealt 8 ounces (226.79 grams) of methamphetamine every couple of days.

Tucker, one of Ware's co-conspirators, also testified during Ware's trial.  He stated that in either 2010 or 2011, he and Ware began doing business together off and on, initially selling crack cocaine before moving on to methamphetamine.  When Tucker was released from prison in 2016, he owed Ware money for previous methamphetamine purchases.  Because Tucker did not have the money to pay his debt, Ware made Tucker work for him again selling methamphetamine.  Ware initially gave Tucker a "pack" (7 grams) of methamphetamine at a time to sell.  Tucker

testified that he could not recall exactly how many packs he sold for Ware, but noted that it normally took him 2 to 3 days to sell a pack. Ware later moved Tucker up to selling methamphetamine in "half" quantities (14 grams). By January 2017, Ware had increased his involvement by having him sell methamphetamine in "zip" quantities (28 grams).

Ware was ultimately held responsible for trafficking a total of 211.02 grams of methamphetamine (actual) in and around Carthage, Texas, from 2016 to 2017. Specifically, he served as the source of supply for co-conspirators L. Ingram and T. Ingram's sale of 25.92 grams of methamphetamine (actual) to a confidential informant ("CI") on November 22, 2016. Additionally, in conjunction with co-conspirator Tucker, Ware facilitated the sale of 25.3 grams of methamphetamine (actual) to a CI on January 6, 2017, as well as the sale of 47.8 grams of methamphetamine (actual) to a CI on January 12, 2017. Ware was also held responsible for an additional 112 grams of methamphetamine (actual) that Tucker sold on his behalf, including 10 "packs" (70 grams), one "half" (14 grams), and one "zip" (28 grams).

After Ware was initially indicted in the Eastern District of Texas for Conspiracy to Possess with the Intent to Distribute and Distribution of a Controlled Substance (methamphetamine) and Possession with Intent to Distribute a Controlled Substance, Ware's defense counsel provided copies of proposed exhibits to the court in anticipation of a trial commencing on August 13, 2018. Included in the proposed exhibits was Ware's Exhibit 2, which contained purported Facebook messages between Facebook account lyndell.talley.7 and winfred.ware, a Facebook account known to be used by Ware.[6] In the messages dated May 29, 2018, the user of lyndell.talley.7 claimed he was an informant for the Government in Ware's investigation and made exculpatory

---

[6] Lydell Talley ("Talley") was a CI who was expected to testify at Ware's August 13, 2018, trial.

and mitigating statements regarding Ware's case that were in opposition to the Government's evidence. Based on the contents of the messages and the approaching trial date, the Government moved to dismiss the charges against Ware without prejudice so that the messages could be fully investigated. A review of the information received on Facebook account lyndell.talley.7 revealed that the account was created on May 29, 2018, at approximately 6:10 p.m.

Earlier on May 29, 2018, at approximately 11:00 a.m., Ware and his attorney met with several Assistant United States Attorneys and agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") at the United States Attorney's Office in Beaumont, Texas. During the meeting, the Government provided Ware and his attorney information from the investigation as part of a reverse proffer. This information was later used in the Facebook messages between lyndell.talley.7 and winfred.ware. When the Government interviewed Talley on August 6, 2018, Talley denied creating or using the Facebook account of lyndell.talley.7 and denied sending the Facebook messages to Ware. Talley also stated that the content of the messages was a lie and that he did not write the way the messages were written. Moreover, Talley was previously unaware of some of the information in the Facebook messages in question, including his CI number assigned by the ATF, the investigators' full names, and the true names of some of the co-defendants.

A further review of the information on Facebook account lyndell.talley.7 disclosed that two different Internet Protocol ("IP") addresses accessed the account. Investigators subsequently learned that both IP addresses returned to an address in Carthage, (Panola County) Texas, belonging to Jessica Williams ("Williams"), Ware's girlfriend. Williams was later interviewed and confirmed that Ware resided with her at the same Carthage address from approximately

25

January 2018 until he moved out in September 2018.  Williams stated that she never accessed Ware's online accounts, never used Ware's Facebook account to send messages, and did not create the lyndell.talley.7 account.  According to Williams, Ware frequently used the HP laptop computer in her living room and knew the password to log on.  Williams further stated that she traveled with Ware on May 29, 2018, to meet the attorneys and to attend the hearing in Beaumont.  They drove straight back together to Williams's residence and stayed there the remainder of the night.

Thus, the record reflects that Ware used his girlfriend's computer while on bond to create a false Facebook account purportedly in the name of Talley, a government informant.  He then used the account to create and send what appeared to be exculpatory and mitigating statements regarding himself.  Ware also posted the CI's telephone number, the investigators' full names, and the true names of many of the co-defendants in the case in an attempt to influence, delay, or prevent the testimony of the CI in an official proceeding.  Consequently, Ware was additionally charged with obstruction of the due administration of justice and tampering with a witness by misleading conduct.  Even after his conviction and sentencing, Ware continued to deny responsibility for his actions, sought documents that the court has expressly prohibited him from possessing, and filed numerous *pro se* motions with the court while also represented by counsel.

In addition to the nature and circumstances of his offenses of conviction, Ware's criminal history similarly demonstrates that he poses a danger to the community.  Ware has been convicted of assault causing serious bodily injury to a family member, possession of marijuana, driving while license invalid (3x), and displaying a fictitious license.  In addition, Ware has been arrested for theft of property ($50-$500), robbery, evading arrest/detention with a vehicle (2x), assault,

possession of marijuana, conspiracy to possess with the intent to distribute and distribution of a controlled substance, and possession with intent to distribute a controlled substance. Further, as mentioned above, Ware has a record of disciplinary violations at the BOP.

In support of his motion, Ware points to his completion of recidivism-based programs, post-offense conduct, and positive offender characteristics to indicate that he poses a low risk for recidivism. While Ware's efforts are commendable, the court is not persuaded that Ware is no longer a danger to the community. Courts have long recognized that "continued drug dealing does constitute a danger and threat to the community." *United States v. Hare*, 873 F.3d 796, 799 (5th Cir. 1989); *accord Grimaldo*, 2022 WL 4126106, at *7 (denying compassionate release to inmate found guilty of participating in a drug trafficking conspiracy involving large amounts of cocaine and marijuana despite his completion of numerous programs and saving his cellmate's life by performing CPR, reasoning that he continues to pose a danger to the community based on the totality of the circumstances); *United States v. Dotrey*, No. 2:13-CR-004, 2021 WL 4191454, at *8 (E.D. Tex. Sept. 15, 2021) (denying compassionate to drug trafficker despite his insistence that his offense was non-violent, he had been rehabilitated, and he had been rated by the BOP as having a low risk of recidivism). "Although a defendant may not have been convicted of a violent crime, 'that does not make his offense any less serious or dangerous to the community.'" *United States v. Thomas*, No. 14-246, 2021 WL 1721014, at *3 (E.D. La. Apr. 30, 2021) (quoting *United States v. Bailey*, No 17-244, 2020 WL 6701533, at *3 (E.D. La. Nov. 13, 2020) (citing *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) ("The harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'"))).

Regarding Ware's history of drug abuse, courts are precluded from "lengthening a prison term in order to promote a criminal defendant's rehabilitation," but in the present case, the court is deciding whether to reduce, not extend, a sentence. *Tapia v. United States*, 564 U.S. 319, 321 (2011); *see Chambliss*, 948 F.3d at 694. Here, Ware has a long history of abusing marijuana. Ware's PSR indicates that he used marijuana daily from 2006 until he was taken into custody in 2017. Therefore, releasing Ware may facilitate his drug abuse, as he would gain unfettered access to over-the-counter medications and illegal drugs outside the BOP.

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, and deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when the district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting the defendant's argument that the court gave too much weight to his criminal history and finding that "a mere

28

disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal"). In view of the nature and circumstances of his offenses of conviction and Ware's history of substance abuse, the court cannot conclude that Ware's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole.

Additionally, it is unclear whether Ware would have access to adequate medical treatment if he is released. Probation reports, and Ware's medical records indicate, that his medical needs are being met by a variety of providers at FCI Beaumont. When Ware was interviewed in connection with his PSR, prepared on August 20, 2019, and later revised on December 2, 2019, he reported "no history of health-related issues and maintained that he does not take any prescription medication." Nevertheless, he was described as six feet and three inches tall and weighing 260 pounds. Hence, he was obese before he entered the BOP. Moreover, in Ware's first motion for compassionate release, he acknowledges his "youth and lack of health issues." Thus, it does not appear that Ware was being treated for any medical conditions prior to his conviction and it is uncertain whether Ware would have access to the proper treatment and medication outside the BOP.

In addition, granting Ware compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence. 948 F.3d at 694. The district court determined that the defendant's terminal illness "constitute[d] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after

serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.* at 694; *see Rollins*, 53 F.4th at 359-60; *Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"); *accord United States v. Rodriguez*, 27 F.4th 1097, 1100 (5th Cir. 2022). In the case at bar, releasing Ware after he has served approximately half of his 180-month sentence would similarly minimize the impact of his crime and the seriousness of his offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct. On balance, compassionate release is not warranted in light of the applicable factors set forth in § 3553(a).

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Ware's track record is similarly a poor one. In this instance, there is no reason to believe that Ware would not revert to his prior drug-dealing and drug-abusing behavior as well as his efforts to obstruct justice if released from prison at this juncture. *See United States v. Wymer*, 573 F. Supp. 3d 1208, 1212 (N.D. Ohio 2021). Like the court in *United States v. Lewis*, this court concludes that "Defendant's current term of imprisonment was and remains appropriate." No. 17-CR-28-FPG, 2021 WL 4519795, at *3 (W.D.N.Y. Oct. 4, 2021). Ware committed serious offenses that

justified his sentences, and the circumstances he now identifies do not render those sentences unjust or inequitable. *See id.*

III.    Conclusion

In sum, Ware has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.  The concurrent 180-month sentences and the concurrent 120-month sentence of imprisonment imposed upon Ware for his drug-trafficking offense, his obstruction of justice, and his tampering with a witness comport with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or release him from prison at this time.  Neither his health, the length of his incarceration, nor his efforts at rehabilitation merit a reduction of his sentence under these circumstances.

SIGNED at Beaumont, Texas, this 28th day of April, 2025.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE